Could the lawyers please approach, the lawyers are going to argue the case. Introduce yourself please. My name is Anthony Scariano, I represent the appellate. I would like to take ten minutes in my primary argument, which is the twentieth oral argument. Good morning your honors, my name is Mary Welsh, I represent the State Board of Education. Good morning your honor, Robert Hall, I'm here on behalf of Southland College Prep Carter High School. Yeah, have you worked out a method in which the two of you will be able to... Evenly divided your honors. Ms. Scariano brought up the time involved in this oral argument, how much time? Well, assuming that the court follows the rule of twenty minutes per side, we're assuming ten minutes. Alright, Ms. Scariano said ten and twenty. I was trying to follow the rules of twenty and ten, and flip it. Well, normally we give you fifteen minutes, so why don't you figure out how to do that in fifteen minutes. I think you could do it easily. I'll take ten and reserve the rest of my time. Alright, alright. And we don't strictly follow the... If there is something additional, we're going to give you the time. Let's try to do it within fifteen if we can. I think you can. Let's proceed. Thank you. Before I begin, if it pleases the court, on behalf of council assembled and their representative constituency, we would like to give our condolences to the court on the passing of your partner, your colleague. He's a fine gentleman, and I'm one of the jurists. May it please the court, the standard of review is clear error in this case. If it were a question of law that is decided, it's clearly de novo review. If it's a question of fact, it's a manifest weight of the evidence. If it's a mixed question of law and fact, and how the facts are applied to the law in this case, it is clear error, or clearly erroneous. That is, this court must find that there is an absolute error made by the panel which you review, and you review the State Board of Education's decision, not the decision of the judge and administrative review. There has to be a rational purpose for a statute to guide the premises. And one of the requirements that we contend jurisdictional in the statute is that if one grants a charter school application, that there must include evidence to determine the charters proposed are economically sound and both the charter school and the school district. And we contend, and it's our major argument and appeal, the State Board of Education considered that issue and considered the issue of our expert that said the school district losing students to the charter school would be in bankruptcy in four years. And their own person, that is the finance director of the State Board of Education, said it would be three years that we would be financially bankrupt. And the State Board of Education ignored the issue, went ahead and granted the charter school. There's much said in the briefs about... Counsel, I'm not sure that it's fair to say that they ignored it. They simply didn't feel tied to that testimony that it should dictate the outcome in this case. They felt that the charter school was in the best interest of the district. We'll get to the best interest of the district in a second, Justice Garcia. I contend jurisdictionally the statute says it must include evidence that the terms of the charter as proposed are economically sound for both the charter and the school district. The only guidance we have in this case is the Rockford case by the Supreme Court that said that there was evidence that the school district would be ravaged. And that's, I argue, that's jurisdictional. If not, then every charter school that's going to cause this effect to a school district is going to put a school district out of business to have a charter school. And didn't Justice Fitzgerald address that very point, saying that pure economics doesn't dictate the result, that there's no impunity simply because the financial resources aren't there? Yes, that was his third holding under finance. His first holding was the funding, quote, reallocation should not imperil the entire school district. I understand that there may be different holdings. My point is that the Supreme Court of Illinois said that pure finances doesn't dictate the outcome. No, but it said that the Charter School Act wasn't intended to drive fiscally challenged school districts out of business either. But it is there to instill competition, and competition sometimes comes with costs. It's going to be painful to someone because competition isn't an easy thing to effect. Judge, we would argue that forces are going to come with costs, but coming with costs is different than driving a school district out of business. Now, Justice Fitzgerald did say, we do not hold that any school district experiencing a budget deficit may deny a charter school proposal with impunity. But the inverse is also true. Having fund balances doesn't mean the school district must approve any proposal. Here's the predicament. On the one hand, you say you can't drive a school district into bankruptcy. On the other hand, you say just because we have these financial resources doesn't mean a charter school should be granted either. So when do you grant a charter school? No, we won't drive one school district out of business. That's the balancing test, Judge. Well, but at this time, the school district is going to remain in business, and will remain in business even if, three years down, should there be financial resources, things will have to change to make sure that the resources are there to provide every student with an education. Well, possibly this is one of the reasons why there are only, to my knowledge, without consent of a local district, only two other charter schools outside the city of Chicago that exist. Because of this very anomaly. We are talking in the legislature now about consolidating school districts for cost. It's useless to have 986 school districts in the state of Illinois when we can combine them and take advantage of an economy of scale. The problem is, Judge, when you take 125 students a year away from us, we can't make up that loss because we have fixed costs. And the fixed costs don't go with those students. My client spends $16,000 a student. But just so it's clear, Mr. Scariano, that's true in every case. In every case where there's a charter school that is approved, there's going to be a loss of students and loss of the funds that are attached per student. And that happens all the time. With all deference, Your Honor, I would suggest it doesn't happen all the time. Because if the fixed costs... Doesn't every school, every school district have fixed costs? They do. But the cost of the school district taking the students to the charter school, if it had already absorbed fixed costs, wouldn't it have brand new fixed costs for those students? I mean, we can't close two classrooms. We have bonds to pay off. We have security to pay. We have paraprofessionals to pay. All of which are built into the system of education that we've got. It's not losing the money that makes it jurisdictionally inappropriate. It's putting us in financial peril. That's why the statute was written. Why else would the legislature say, but you can't do this if there's financial peril and you leave one of the districts financially unsound. The legislature's words have to mean something, Judge. And the words mean our guides for both the school district in terms of deciding whether or not to allow a charter school to be created as well as the Illinois State Board of Education's review of that decision. And those factors must be considered, and they were in this case. If this panel's decision is that of the facts in this record, that it's perfectly appropriate to grant a charter school to exist with the financial disadvantages in this record, there will be a thousand charter schools in the state. Understand this, Mr. Scarlino. We're not establishing a charter school at all. All we're simply doing is reviewing the Illinois State Board of Education's decision and deciding whether or not it is clearly erroneous or not. But, Judge, the financial experts said there would be financial harm of a cataclysmic nature to my client, their own person, not mine. They reviewed the record. But how do we get around Fitzgerald's decision? You don't have to get around it at all. You can find as a matter of fact that this would drive a fiscally challenged school district out of business and that reallocation should not imperil the entire school district. You don't have to spend $16,000 on a kid if you're going to take him to charter school. And what do you do with the obvious need that generated the charter school proposal for a change in the educational system that isn't adequately serving, according to these parents that are looking for an alternative school district or an alternative choice in schooling? What happens to them? What happens to them? I'm having a difficult time answering the question because of the way this record gets to this court. Originally, the charter school application didn't even go to my client as required under law. It went right to the state board saying this is our plan. The state board says we're going to have to follow the statute. We get a different plan that we have to have a public hearing on and vote yes or no on. We get a plan, we vote no on it. Between the time we voted no on it and the state board reviewed it, the plan changed. The plan changed from 100 plus to 50 under. The amount of students changed. The way the students are going to be selected. The requirement that students and their parents sign charters were put in there. All as a result of the state board of education to have a next party conversation. So what are you asking for, Mr. Scariano? Are you asking for a remand to allow the exact proposal that the Illinois State Board of Education ruled upon to go before the district and allow the district to have input on that? That's the only way to follow the statute. Otherwise, the statute hasn't been followed. But I thought your request was that we reverse outright. You may. If the judge doesn't want to take a leap with me that far, you can remand it for a proper record. I contend on the record that's before you, if you buy what the state board of education did. Well, it's not a question of buying. It's a question of do we give it the deference that our case law directs us to. By my ill use of the phrase buying, I meant the procedural aspects of the state board of education going behind our backs and changing the charter school proposal we ruled on so that we got a different proposal that we hadn't ruled on that went before the state board of education. If you buy, that's all right. Then reverse on the basis that jurisdictionally the statute hasn't been complied with. If you think that there are inaccuracies or improprieties in the way the state board of education handled itself with ex parte communications and telling the charter school how to change its application so that maybe you would get a better shrift with the state board of education, then remand the whole thing and tell the state board of education to stop playing games because that's what they did in this case. It's a clear aspect of it. On that basis, I'll take either a remand or a strict reverse. Thank you. I'll reserve the rest of my time. I just wanted to say this. You do have a due process violation allegation even though you don't ask for a remand. You do allege that the school board's due process rights were violated by the second proposal not coming. You're correct. This court can search the record and find that the record is inappropriate for review based upon what happened procedurally here and to refine the record so that you've got something to review that's not the hodgepodge of changing proposals at the last minute and playing these shell games. I believe jurisdictionally you've got the ability to reverse outright as the Supreme Court did in the Rockford case on this very reason. Thank you. Good morning, Your Honors. May it please the Court. I'm going to be speaking about the two main issues that have come up today, the economic soundness and the procedural aspects. Mr. Hall, my co-counsel, is going to be speaking about the particulars of the proposal, the performance criteria, best interests, and admissions criteria. Can you answer one question? Sure. Did the Supreme Court reverse outright in Rockford? No, I don't believe it did. What happened, the important thing in Rockford, which the Court noted, is that toward the very end the Court says, we are not saying that if there's a deficit there's not economic soundness, even if there's a deficit. And so what we have to remember here are the underlying facts. The school district denied the charges. Right, exactly. It's completely right. And so it got reversed and then we're denied. Exactly. And then the Supreme Court. Right, right. Here, right, the scenario is completely different. And so what we have to do, I agree with counsel, that the overall decision obviously is reviewed for clear error, which is a very deferential standard of review. But the components of the Board's decision are reviewed separately and factually. What components are there? There is some concern that the components before the State Board were not components that were presented to the district. Well, I think there are several components that the district already knew. The most important one, I think, is that the district has consistently, consistently had a very healthy surplus, consistently. This $35 million, $40 million, whatever it ended up being, is not a one-off. It wasn't a windfall. They have been very fiscally prudent to their credit, to the district's credit. And it is that, so that is one of the facts, and it's undisputed. And, in fact, we know that it was healthier than the district thought it would be when it initially denied the proposal and before it figured out what the fiscal year 2010 numbers were. Do you believe that there would be any change in the district's position if there was a remand for consideration of the exact proposal that the Illinois State Board adopted? I mean, if you're asking me if I think that the district would be in favor of the proposal, no, I don't think so. But, obviously, that's a question better asked to Mr. Scariano. Another undisputed fact underlying the economic soundness decision is that the district had no short-term debt. It had some long-term debt, obviously bonds and so on. It has no long-term debt. What about the concern of bankruptcy three years down the road? Isn't that a proper concern? And why wasn't that given greater weight, or should we examine why it wasn't? Well, as the court noted, here what you had is you had two opposing factual viewpoints. They're claiming that there was nothing opposing. Well, I mean, if you look at the hearing, if you look at the evidence, there was. There was the two financial Did anyone testify that, no, the district was not going to go bankrupt in three years? There were two financial analysts who testified in favor of the charter school, Mr. Tepscott and Mr. I know I have his name here somewhere, but there were two. Right, but did they testify that the school board was not going to? Yes, in fact, Mr. Tepscott, I believe it was, said, they have four years to phase in the savings that they will achieve by losing students. And I don't think anybody thinks that, certainly the school board didn't say that they're going to save, for every student dollar they leave, they're going to achieve student dollar savings. I mean, that's not going to happen. With respect to the charter school, it can be proportional. You do still have fixed costs. You have three buildings. You have this, but you have other variable costs. You're going to have to, the district has to make hard choices, just as it would have to make hard choices if it didn't get funding from some other source. They have to look at administrative salaries, for example. They have to look at administrative ratios. They have to look at class size. They have to look at whether they're going to have a new administrative building. They have to look at all of these things and say, are we going to get these costs? Are you saying that all those things were considered by the board in issuing its decision? Well, yes. I'm saying that the board considered whether or not it would be possible to phase in the cost savings over time to achieve, to not force the district into bankruptcy. Again, there were two opposing views at the hearing. One said they're going to be able to phase it in. They're going to have to make hard choices, but they're going to be able to phase it in over the four years. And the other, you know, the financial people for the district said, no, we're not going to be. We're going to go into bankruptcy in three years instead of two. And now, just facially, if you look at that, that doesn't make any sense, because what they had been saying is if you have 1,000 students at 125 percent, we're going bankrupt in two years. But then they're also saying if you lower the students by 50 percent, and if you lower the cost, the reallocated money from 125 percent per student to 120 percent, 100 percent per student, so if you lower it from 1,000 students at 125 percent to 500 students at 100 percent, even lower it by like 60 percent, we're still going to go bankrupt in a third year. I mean, just, you know, you can look at, hear those numbers and go, that doesn't make sense. And that's even, remember, Ms. Vestbar from the State Board said, you know, I don't know what kind of savings, she did testify that there was going to be a financial detriment in 2014, fiscal year 2014, but she goes, you know, I'm using numbers that I don't know what they're going to do. I don't know what kind of savings they're going to have. I don't know what they're going to do about benefits. I don't know what they're going to do about salaries. I don't know what they're going to do about their buildings. I don't know what they're going to do. So she just didn't have enough money, enough knowledge, rather, information from the school district. And this, interestingly, you know, ties into the procedural. Let me just stop you for a minute. Is there any doubt in your mind that the school district is going to lose a tremendous amount of money if this is allowed? There is no doubt. Is there any question about that? No, there is no doubt. That's correct. There is no doubt in my mind that they are going to lose, you know, whatever the cost per student is. I think the most recent one is about $16,000 per year. Financial problem. Right. But they're also going to lose the students. And while they will not have necessarily a dollar-for-dollar savings, you know, we all know, you know, if your kid goes off to college, I still have the mortgage analogy at the hearing. Well, if your kid goes off to college, you still have your mortgage, but you don't have that milk bill anymore. Your insurance will go down. Your car insurance will go down because the kid has his own car and so on. So you achieve other savings. You're not going to achieve one-for-one savings, but you are going to achieve savings because you're going to lose, in the end, 12% of your student body. And you're not going to have the same cost when you lose 12% of your student body. I mean, that just doesn't make sense. That means that you've increased your class size. You've increased your administrative, you know, student ratio. You've increased everything. I mean, that doesn't make sense. They are going to lose money. There's no question about that. And that's the case with every charter school. Exactly. And the superintendent's recommended decision acknowledges this. It says under the statutory scheme, it's unavoidable that this school district, really like every school district, is going to lose money. But that's the decision that the General Assembly made as a matter of public policy. And unless it's, you know, economically unsound, unless they really will become insolvent. Now, going back to the procedural issue, remember, the school district did not respond to the documents that the charter schools submitted in response to the school board saying, we need more information. Remember that the charter schools said, you know, I know that originally we were talking about 1,000 students at 125%, but now let's talk about 1,000 students at 100% instead of 125%. So the school board made no response to that. It didn't respond. And, in fact, the charter school also said we'll achieve, the district, we'll achieve a savings, a one-for-one savings. The school district, even though it, you know, vociferously objects to it, it didn't say anything to the school board. It didn't submit any documents saying, look at this. They're completely wrong. And, in addition. But you'll concede that the proposal did substantially change from the one that the corporation presented to the district. To the district. Absolutely. That's certainly true. Is there a due process problem in that? Well, first, there's no due process problem that I know, because all the school board is saying, that the district is saying, is you didn't follow state rules. Well, state rules are not, you know, are tantamount to procedural due process in a constitutional sense. And they also haven't explained to me why a school district as an entity, state-created entity, would have due process rights. But putting all those aside to say that there is a procedural right that they had that was violated is simply not true. What happened here was that the staff talked to the charter school as both the statute and the rules allow. And by that I mean 105 ILCS 5-27A-11F and 23 Illinois Administrative Code 650.60 allows the board to do to talk to a charter school about its proposal. And then what happened was that they got the proposal, the school district got the proposal, the modified, initially modified proposal, 1,000 students at 100 percent instead of 125 percent, and didn't submit anything to the board saying, no, no, no, this is completely wrong. Then when there was a, the superintendent further, the superintendent further modified the proposal and said, not 1,000 students at 100 percent, but 500 students at 100 percent. Again, the district did nothing. It didn't, and in fact, what it said at the hearing, interestingly enough, was we ran the numbers, we looked at it, we gave it more than a quick look. This is at C, you know, common law record 1652. But then they didn't say, and look at our chart. Our chart says we're going to be losing, we are going to be losing money, you know, we're going to be in a deficit after four years. But, you know, let's face it, even if they had said we're going to be in a deficit after four years, they had shown that they were going to be in a deficit after four years, which just doesn't make any sense, really, given the amounts of money we're talking about here. They, you know, Rockford said being in a deficit doesn't mean you have, you don't have economic soundness. I mean, so at the end of the day, you know, what we're talking about here is that there were facts that were predicate to the financial soundness decision, undisputed facts, you know, a long-term, extremely healthy, you know, surplus that they had, and that they had no short-term debt, and they, you know, the superintendent took into account that there was not going to be any transitional aid, which would have made a huge difference, but the General Assembly did not, was not able to fund that, you know. And that the first year, remember, the school district has about a $75 million budget operating budget. Yes, operating budget. But they were only going to lose a million, under $2 million for the first year and multiples thereafter. So in the end, I think it's very clear here that the economic soundness decision is predicated on facts that are not against the manifest weight of the evidence, and that the economic soundness decision itself is not clearly erroneous. And also that the... I do have a question regarding the facts point. It would certainly be far, would make our job a lot easier if the school board had, in fact, laid out the facts as it found them following a hearing, and we would then be able to say, these are the facts, as opposed to getting into this dispute between the parties as to what are the facts and what did the school board actually decide and what's the standard of review that we apply here? Well, again, I think if you look at the superintendent's decision, which was incorporated into the board's decision, that explains the very facts that I'm talking about, that there was a healthy long-term surplus, that there was no short-term debt, and that, you know, although the financial adverse effect is unavoidable, it wasn't going to be so severe that it would make the district be not economically sound after the proposal, as modified went forward. And so, yes, if I could have one last minute for the remedy question, which had come up. You know, the remedy here is not reversal, obviously. You know, what would happen is if the plaintiff, if the school district is, I'm sorry, if the school board, the state school board did not allow, give the school district an opportunity to be heard, and again, it gave the school district opportunities to be heard again and again, and the school district did not take advantage of those opportunities. Then you would remand for hearing to the board, but you certainly would not outright reverse it, you know, keeping in mind that the school is now in its second year of operation. Thank you. Good morning, Your Honors. Robert Hall here on behalf of Southland College Prep Charter High School. As an initial matter, Your Honors, I want to point out that it seems that what District 227 is suggesting, contrary to the statute that is being interpreted here, and contrary to the case law, that this is all a gotcha. That what is supposed to happen is that a proposal for a brand new school is submitted to the school district, and it's a stagnant, never-changing thing that we look through those pages as the decider and say, this is what you gave me, and we are not going to ask a single question of the proposers of Southland Charter School. We are not going to engage in a dialogue because, truthfully, we have no interest in knowing what this school is really about. We've already decided that we're not going to give you an opportunity to provide an educational option to the children in your area. We agree with you, 227, that it's all about the money that admittedly is going to be reallocated to these children at Southland because it's the belief of Southland and the community leaders, all of the mayors who spoke at the hearing, and the parents of these children that they deserve better than they're getting in 227. But leaving all that aside, 227 is arguing to you today, forget it. They handed us a piece of paper. We looked at the piece of paper. We don't have to do anything more than that. And at the end of the day, we get to say, gotcha. You didn't do this. You didn't do that. And I would submit to your honors that there's no school that could ever be started under that scenario. There are always questions. I understand all that, counsel, but here's the difficulty. There has to be some sort of relationship between your charter school and the district. You're occupying the same area or serving the same students. So it seems to me that if you're going to build up a relationship between these competing educational systems, that you would want to be able to work with the school board and present to them the eventual final proposal that is ruled upon by the state board of education. We absolutely do want that, your honor. First of all, we do want a partnership. We went to 227 as required by the statute. But you presented a different proposal. We presented a different proposal than what was ultimately approved by the charter. And it was a more costly proposal, and they rejected it. Right. And I would just point out to the justices that in the case board of education versus community consolidated school district versus Illinois State Board of Education, there was an actual holding of the appellate court saying, we find that by fair implication and intendment of the express provision, which must be construed liberally of this charter school law, the board is authorized to reverse the denial of a charter upon the finding that the proposal substantially complies with the act and that the approval of the charter would be in the best interest of the student if certain conditions are met within a specified time period. Accordingly, we hold that the state board had the statutory authority to reverse the decision of the local school district on condition that the board submit a viable facility plan and an updated budget. And in some ways, justices, the irony here is that it was because the state board looked at the financial implications very carefully and said, we see that they've got almost $40 million in surplus. But even with their $40 million in surplus and a surplus that's going to continue year after year if they're fiscally responsible, we think instead of allowing you to have 1,000 students, we're going to cut that back to 500. Because we know, looking at those numbers, that if they lose that little amount of funding and have four years before 500 students are there, they can do the responsible thing. They can cut the cost that they need to cut, knowing that 500 students and their parents are begging for an option that's being provided by Southland. And justices, I do want to just emphasize, if no one wanted to go to Southland, they wouldn't lose a dime. The fact is, we have last year 272 families joining our lottery to come for the 125 spots that were advertised for our new freshman class. If those people weren't begging for this option because they want the best education for their children, we wouldn't have any loss of funding. So the idea that we can say, we're going to look at the first piece of paper, the state board's hands are tied, even if they look at the finances and can see a way that they analyze everything will be fine for you as a school district by lowering the number of students and thereby lowering the amount of money that will be reallocated to Southland, that doesn't matter. Their hands are tied. That was never the intent of this law. So you're saying that the school board did exactly what it should have done? Exactly. In what we rely on them. They're the experts in this matter. They know about school finances. They see these surpluses. But I think most important, justices, they've seen the long, long record of what's happening in these school districts. And we're not here to blame anybody. There are factors, as we all know, that are societal factors. And this brings me into the discussion of what's in the best interest of these children. And there's argument in our briefs about that's not even an appropriate issue because District 227 didn't talk about that in its brief. We put that to the side. We believe that the record here is so clear that this is in the best interest of the students and that the state board so unquestionably got that right that we're happy to talk about it. And what the State Board of Education said is we are looking at what has happened in 227 over a long period of time. And we're also looking at what has gone on in District 162 over the nine years since Dr. Blondine Davis took over as superintendent there. And we see that for the elementary district, they've had an upward trajectory. They went from 55% meeting or exceeding. Now they're at 81.4%. As the papers that they want to talk about so clearly state, District 162 is the only school district in the entire state of Illinois that's got an above 80% meets or exceeds number along with more than 50% of its children who are economically disadvantaged. Did all this play a role in the board's decision? Absolutely. What the State Board of Education said in its analysis of whether this was in the best interest is we look at what has gone on there and I quote, there is no question that there is, I'm sorry, quote, the performance gap here is undeniable. They looked at what these two districts were able to accomplish and said the performance gap is undeniable. They talked about the scores. At that time, District 227 had managed to get up to 39% of its children meeting or exceeding. The State Board also said, but the way that they did that was by excluding 41% of the juniors who should have taken that test from the test. We now know that they're down to 28% meeting or exceeding this year. Meanwhile, as the court said, District 162 has that upward trajectory. And we also see that District 162 has more children who are economically disadvantaged as measured by participation in the free and reduced lunch program and they have a higher number of black African-American children. They're above 90% on the number of minority children. They're above 75% on the number of economically disadvantaged, numbers that are far greater than District 227 and yet they're getting it done. I think you've adequately summarized that. Okay. I also was tasked, Justices, with speaking about the fact that there's going to be a signed acknowledgement among Southland and the parents and the schools that we're all in this together that would be signed after children are enrolled. There was a suggestion in the papers of 227 that that somehow was going to be something that denied enrollment to children. That's a red herring. The children are already in by the time they sign that agreement along with their parents. All that is is an affirmation that we're all in this together and we, the three parties, the school, the children, and the parents are going to do everything we can to make these children succeed. So how that ever got misconstrued as something that denies anyone enrollment is just, it doesn't make sense to me. So I'll dispatch with that quickly. The last thing is, were there sufficient goals, objectives, and performance standards? Absolutely. Right from the time those initial pieces of paper that are so important, Southland said, we're going to do these things. We're going to have an extended school day. Everything will be college prep. Every course will be college prep. Here are the tests that we're going to give. Most important, something that District 227 discounts, Southland said, we are going to honor and abide by what's required under No Child Left Behind. They said, well, everybody has to do that. How does that make them doing anything special? Well, at that time, what that meant was that they were committing to having 85% or more of their students meeting or exceeding state standards. And we know that at that time, District 227 was only having 39%, even with the exclusion. Now we're down to 28%. So it was a big deal. But the State Board said, we'd like to hear more about that, as they are allowed to do under the regulations. Let me ask you, would that be a finding of fact, that there are adequate goals? Absolutely. So I believe that the manifest weight of evidence standard would apply to that, Your Honor. I have nothing further, unless there are questions from the court. Thank you very much. Thank you. Rebuttal. At whose expense do we get equity in this case? By everyone's agreed figures, at the end of four years, whether they're fully staffed as a high school, we have lost $41,760,000. If you divide that by the number of kids that are left in 227, we go from $16,000 a kid to $900 a kid, in order for them to say it's $16,000 a kid. Where is the equity of that? We've got to take care of these 500 kids, at the expense of the 4,000 kids that are in District 227. And they admit that we have to cut. What do we cut? The $500,000 liability insurance policy premium we get in District 227,  How big do our class-student-teacher ratios have to go up, in order to be able to afford them the $16,000 that we used to have, that now we have to operate on $900? Don't tell me for a minute the State Board of Education wasn't concerned about its finances. Their experts said, on a blind question from the State Superintendent, well, we don't believe this is two years bankruptcy. What do you have to say about that, Deb Vestma, Chief Financial Counsel for the State Board of Education? That's not two years, it's three years of bankruptcy. Okay. So three years from now, we'll be back with the State Board of Education, turning our keys in, saying we can't run it anymore. Let's talk about the equity in how this was done. District 227 didn't have to say anything in this public hearing. It ran the numbers itself, and it was $41 million. What do you suppose their answer is going to be? Let us buy a red carpet for your front door? No. But the proposal we reacted to, to the State Board of Education, wasn't the green piece of paper we got three years ago. It turned out to be a red piece of paper that was redone who knows how. It's not in the record. I can only guess what would happen. We do know there were telephone calls between the State Board and the 162 Southland Planning Committee. We do know there was a meeting we weren't invited to. We do know that the State Board asked that changes be made. We don't know what changes there were. And who cares about what we have to say about that? The whole purpose of the statute is to get our input on it. And the notion that we sat by and didn't say anything is preposterous. There is a provision in the Charter School Act that allows schools by contract to agree to these things. And we can enter into a contract with them to say, here's how we'll agree. Let's say we do. The statute says before we make any change year to year, we have to meet and agree, both parties, to every single change made in the charter school proposal. What sense would it be for this panel to issue a decision that says, oh, it's de minimis that the State Board of Education rewrote their proposal for them? And you may be asking, as I did in preparing for this case, what's with the State Board? Where do they go up in this case? But there is that argument that what the school board did was help craft a proposal that was less financially burdensome to the district, and yet still met or still addressed the educational concerns of a great number of people. And to that extent, the school board acted as a public body would by trying to reach an accommodation that was fair to both sides. What has begun, Your Honor, is the notion that we walked into this case with a $37 million cash surplus in our funding balances. Nobody bothered to show you in the record where the State Board of Education mandates that as a requirement or as a program of school accountability. That's cash flow to pay bills in six months because of the delay in state aid payments, if we are lucky to get all of them in the report that we ought to get, or delay tax cuts. That keeps us afloat. That's not a positive balance we can go spend on computers or a new pool for the school district that doesn't have any pools. Okay? That's not a positive aspect. That just lessens the burden a little bit. We were out of money two months later than earlier. What this class decides is whether or not the statute has been met and whether jurisdictionally the school district is being left in a poor financial condition than it was when we started. The statute doesn't say we have to prove we're going to be bankrupt. It's going to be a negative impact on us, but we have to prove. Their own people say that they're going to be able to keep a pupil funding level based upon their contract of $16,500 a kid and do the simple math. Ours is going to be $900 at the end of four years. If that isn't a big enough impact to reverse outright, I don't know what is. But isn't it fair to say that the conclusion regarding three years, what would happen three years down the line, was based on the assumption that everything remains the same? And if things don't remain the same, things cannot remain the same. No, by definition it all remains the same. Well, but you're talking about fixed assets. When you take $900 per kid away from the kids we spend, that's how things don't remain the same. If we cut from $16,000 a kid to $9,000 a kid that we're spending, things don't remain the same. That's how you make up a deficit. Why do my kids have to pay for that? Why doesn't that have a financial impact to your interest? You can't ignore the fact my kids are paying for that if there's a way they can pay for it. I can't close a building down when I lose 500 kids in a 4,000 school district pupil attendance area. I've got no pools to close down. I've got a security force that has to be paid. Do our teacher ratios go from 21 kids a teacher to 42 kids a teacher? Maybe. Is that what you want to put your imprimatur on? That it's okay when we do things like that? I have to stop you, Mr. Scariano, because you address us as if we're issuing this decision in the first instance. We are not. I don't mean to bait you, Your Honor, with that. I may have gotten too close to the edge of the jury, telling the jury that my client is a neocredit agency. All right. But take two steps back. Give us the opportunity to do it right, at least. Let us know what moving target we have to hit. And we didn't get that right. And where does the State Board of Education get off? Currying favor with and championing something we've never seen, that they write for us to respond to, and then decide it's in the best interest of kids. Now you're hurting a little bit. Make some cuts. Inexcusable. A remand or an outright reversal is fine. This can't go on. The 4,000 kids left in District 227 can't pay for the $16,500 a year they used to get that the charter school gets now, and we have to pay for it. Thank you, Your Honor. Thank you. You guys gave us a very interesting case here, and the briefs were very well done, and the arguments were very well done. We'll take the case under advisement. The court is adjourned.